DEPPE et al. v. GENERAL MOTORS COR-
PORATION.

(District Court, D. New Jersey. October 20,
1926.)

**1. Patents ⟨⟩64.**

Showing of earlier apparatus cannot con-
stitute anticipation of process claims, unless ac-
companied with directions in the patent.

**2. Patents ⟨⟩173.**

Patent having involved new principle, pat-
entee is not limited to exact apparatus shown
and described, but is entitled to broad enough
interpretation of claims to secure real value of
contribution to art.

**3. Patents ⟨⟩328.**

Deppe patent, No. 1,335,665, for method of
preparing explosive mixture for combustion in
heat and power unit, claims 10, 16, 25, 26, 27,
28, 29, 33, 34. and 35, held valid and infringed.

**4. Patents ⟨⟩328.**

Deppe patent, No. 1,360,098, for a super-
heater manifold, claims 15, 16, and 17, held
valid and infringed.

**5. Patents ⟨⟩160.**

Where language of patents is free of am-
biguities to reader skilled in the art, there is
no need of resorting to file wrapper for inter-
pretation of disputed words.

**6. Patents ⟨⟩168(1).**

Arguments of patent solicitor, inconsistent
with whole history of patentee's doings, includ-
ing experiments, letters, claims, and specifica-
tions, held not to create an estoppel.

In Equity. Patent infringement suit by
William P. Deppe and another against the
General Motors Corporation. Decree for
plaintiff.

Gifford & Scull, of New York City (Liv-
ingston Gifford, George F. Scull, and New-
ton A. Burgess, all of New York City, of
counsel), for plaintiffs.

Melville Church, of Washington, D. C.,
for defendant.

RUNYON, District Judge. This is a pat-
ent suit upon two patents issued to William
P. Deppe—the first one, a method or process
patent, No. 1,335,665, application filed Au-
gust 3, 1917, issued March 30, 1920; and the
other an apparatus patent, No. 1,360,098, ap-
plication filed April 20, 1917, issued Novem-
ber 23, 1920.

The claims in issue in the process patent
are Nos. 10, 16, 25, 26, 27, 28, 29, 33, 34, and
35, of which Nos. 10, 26, 29, and 35 were used
as examples on the trial. In the apparatus
patent, claims Nos. 15, 16, and 17 are in is-
sue, and No. 15 was used as an example on
the trial. The claims used as examples are
as follows:

In the process patent, No. 1,335,665:

"10. The method of preparing an explo-
sive mixture for combustion in heat and pow-
er units, which consists in charging a mov-
ing stream of highly heated air with liquid
fuel spray, metering the flow, mechanically
breaking up and diffusing the mixture while
applying heat, thereby producing vapor and
wet gas, then highly heating the mixture at
predetermined successive stages to progres-
sively raise the temperature of the mixture
above the boiling points of the liquid fuels,
whereby a homogeneous dry gaseous mixture
in a superheated state is produced, adapted to
maintain itself as such during and after deliv-
ery to the heat or power unit."

"26. The method of operating an internal
combustion engine which comprises prepar-
ing, exteriorly of the combustion chamber
thereof, a mixture of air and hydrocarbon in
the form of and having the properties of a
homogeneous, fixed, dry, gas, the temperature
of which is above the boiling points of the
fuel constituents, delivering it into the en-
gine cylinder on the intake stroke, then com-
pressing it, the temperature and proportions
of the mixture being so regulated that at the
point of greatest compression the tempera-
ture is below the temperature of automatic ig-
nition, then firing it substantially at the point
of greatest compression."

"29. The method of operating internal
combustion engines with a superheated, ho-
mogeneous, dry, gaseous mixture, prepared
exteriorly of the engine cylinder by mixing
spray of liquid fuel hydrocarbons with high-
ly heated air, then churning and kneading the
mixture column while progressively heating
the same, the mixture, after passing through
successive stages of mist, fog and invisible
vapor as its temperature is raised step by
step, being transformed into the homogene-
ous mixture having the properties of a dry,
fixed gas, the temperature of which is above
the boiling points of the fuel constituents,
then introducing it into the engine cylinder
and compressing it, whereby it is superheated
and its temperature raised to a point just be-
low the temperature of automatic ignition,
then firing it, substantially at the point of
greatest compression, the cylinder being uti-
lized as a superheater and explosion cham-
ber."

"35. The method of operating an internal
combustion engine with predetermined pro-
portions of hydrocarbons and air transform-
ed into a superheated mixture having the
properties of a fixed dry gas, by properly
proportioning the passage, through which the
mixture is conducted, in the metering and

heating means, and the combustion chamber, and the passages conducting and applying the heating fluid to the mixture passages, as to shape, cross-section, thickness and length, with heat applied progressively at increasing temperatures in the mixture, until the temperature of the mixture is above the boiling points of the fuel constituents, and which when introduced into the cylinder of the engine and compressed will remain dry and fixed, retaining the molecular and chemical proportions of a homogeneous dry explosive gas mixture of uniform density throughout, the temperature being raised to a point just below the temperature of automatic ignition, then firing it, at or near the point of greatest compression, whereby substantially instantaneous inflammation and complete combustion are obtained."

In the apparatus patent, No. 1,360,098: "15. A superheater manifold forming a conduit for the mixture between the proportioning device and the combustion chamber of a heat or power unit, provided with jackets and pipe connections for utilizing the products of combustion for simultaneously and progressively raising the temperature of the mixture throughout the mass, the relative dimensions of the parts and distribution of the heat being so proportioned and co-ordinated as to develop temperatures throughout the mass of the fuel mixture such as to produce, maintain and deliver to the combustion chamber a mixture having the properties of a homogeneous dry gas."

With the advent of automobiles and their well-nigh universal use came demands upon the mineral oil supply which taxed it beyond the possibility of fulfillment, the result being that mixtures and substitutes were resorted to in an effort so to combine fuel oils with other hydrocarbon liquids as to create an adequate fuel supply for internal combustion engines. Gasoline originally came through the distillation of petroleum, and, in the absence of any appreciable demand for it, was regarded in the main as waste product; in no sense as desirable as the heavier products of the distillation. It was the coming of the automobile which made of gasoline a truly valuable commodity, more so than the heavier cuts from the petroleum, and created a serious problem as to ability to supply the ever-increasing demand.

This problem was attacked from various angles. In the first place, an effort was made to secure a supply of gasoline by separating such amounts of it as were contained in natural gas. Another and more practical attempt to increase the supply was made in the utilization of the heavier petroleum hydrocarbons, breaking or "cracking" the molecule of the hydrocarbon and re-forming it, so that there resulted a molecule of the more volatile portions and another one of the heavier parts. In this connection came the so-called Burton patent, applied for July 3, 1912.

But, despite these advances, there remained the problem of securing the maximum amount of power from the various mixtures available. These mixtures, whatever their source or composition, were largely "wet," and to the extent that they remained wet in their passage into the combustion chambers contributed substantially nothing to the motor's functioning. This tendency to wetness was in part due to the wholesale adulterations which had taken place in the gasoline, introducing hydrocarbon liquids which were not readily amenable to any drying process. At the same time, the wetness was regarded and tolerated by many engineers as a necessary evil incident to the preservation of volumetric efficiency in the motor's operations, as they conceived its needs to be.

It was universally acknowledged that the mixtures offered the public were becoming progressively less volatile, less efficient; but, in the opinion of a great body of engineers, a wet mixture, one in which a portion only of the fuel was vaporized, was to be preferred to any process which reduced the output of the engine through the heating of the mixture, even though there was a consequent tendency to dry the mixture. Their theory had its basis in the fact that there is a greater density in cold gas than in that which has been subjected to heat, and consequently more weight. From that point of greater density and weight they argued a greater amount of energy and a consequent greater engine output. In other words, they found in the foregoing premises their justification for volumetric efficiency, output per pound of motor, and, consequently, their justification for opposition to the heating of the mixture.

Those engineers who opposed the foregoing theories argued that such views were fallacious, in that they presupposed an ability to burn the colder mixture with as much facility as the warmer, and, in imposing such conditions, were disregarding advantages to be gained from heat, which clearly outweighed the advantages of density and weight when unaccompanied by any direct heating process. In support of their views they made efforts in the direction of applying heat in such fashion as would increase the combustibility of the fuel mixture.

But no one prior to Deppe had conceived

of a means or process whereby all of the liquid fuel could be mixed with air, and the entire mixture rendered homogeneous; nor had any one discovered the possibility of producing such a fuel mixture through the application of heat with agitation, but a temperature so low as to preserve substantially all of the volumetric efficiency which a wet mixture could put forth.

Those seeking advance in the utilization of the available fuels were confronted with many difficulties. There were the difficulties of distribution. The mixture, cold or heated, according to the best methods and means then known, was only partially vaporized, did not lend itself to equal distribution of fuel in the cylinders, and this pluralization of unmixed elements resulted in irregular engine performance. Carbonization and detonation were other difficulties. Liquid fuels, going into the cylinders and coming in contact with highly heated piston heads, would become decomposed, resulting in products highly explosive or detonating, which, in connection with carbonaceous substances, inflammable in character and carried to and deposited upon the heated piston head, led oftentimes to pre-ignition.

Another difficulty came through the carbonization and pitting of the valve seats, as well as in the lessened effectiveness of the water circulation resulting from the insulating effect produced by the carbon's contact with the cylinder heads. Deppe, in his process patent, No. 1,335,665, summarizes the difficulties born of the wet mixture as follows:

"Hence, when the charge is ignited by the passage of the electric spark, only that portion of the charge which is in gaseous or semi-gaseous form will instantly explode, while the liquid particles which have collected on the head of the piston will be vaporized or partially vaporized by the heat of the explosion and burned after the first explosion and while the piston is on its downward stroke. This slow burning of the fuel mixture in the cylinders of an engine not only results in a loss of power and efficiency, but adds largely to the production of carbon deposits on the piston head and in the cylinder. It is also detrimental because the excessive heat produced at the wrong time in the stroke has a tendency to burn or carbonize the lubricating oil, overheat the metal walls, and therefore increase the wear between the piston and cylinder, thereby tending towards an excessive use of lubricant, loss of compression, and dilution of lubricating oils with liquid fuel oils."

The problem to be solved, therefore, involved the making use of the hybrid or low-grade fuel oil mixtures, since such mixtures were the only ones available, and in such fashion as to overcome these difficulties as far as possible, and extract from them a maximum of their own potentialities with a minimum loss of volumetric efficiency in the treatment preparatory to their introduction into the combustion chambers. In other words, to extract from low-grade fuels the same power and efficiency secured by the use of high grade fuels. Quoting again from the process patent, we find the aim of the inventor expressed as follows:

"The object of the present invention is to prepare a fuel mixture gas from liquid hydrocarbons mixed with air preferably at high temperature and throughly integrated to produce a substantially stable gas which upon introduction into the cylinders of an internal combustion engine will remain in gaseous form."

And, after reciting the difficulties incident to the forced employment of low-grade fuel, he further says:

"To obviate these difficulties, I have evolved a method whereby highly heated air is charged with the proper amount of vapor or spray of the liquid hydrocarbons and then the column of fuel mixtures is subjected to a sort of kneading process and intermittently and repeatedly heated until by the time it reaches the engine cylinders, the mixture has been developed and integrated into a substantially uniform and homogeneous dry superheated gas which will remain in this state during and after introduction into the cylinders."

The "cracking" process heretofore referred to is in effect a process of separation and division whereby the molecular entities are parted into lighter and heavier component parts, whereas the process of integration contemplates quite the reverse. The Standard Dictionary sets forth the following in defining the word "integrate":

"To make into a whole; bring together the parts of; make or keep complete or entire; * * * to become whole or complete; * * * to pass from a complex and unstable to a relatively simple and stable condition."

As bearing upon Deppe's conception of the steps to be taken in securing an integrated fuel, the following excerpts from letters written by him prior to the filing of his application for the process patent are pertinent.

His letter to Lockwood, dated March 5, 1915, says in part:

"Liquids in air to be transformed into the

real gaseous condition and diffused in the whole air mass."

Again:

"Actually superheat the charge after one gets all of the liquids into the gaseous phases." "Get the gaseous state of the liquids in the air at the lowest possible ranges." "Achieve the homogeneous superheat state of the whole liquid fuel ratio one decides to use."

In a letter to the Oakland Company, dated January 9, 1916, he describes the process as follows:

"Complete vaporization and superheat of the lighter vapors, thoroughly mixed with the medium vapors and both with the heavier cuts of vapors and all diffused throughout the air mass."

The Northway letter of January 11, 1916, expresses the same idea in somewhat different phrasing:

"The lighter vapors mixed with medium and both with the heavier and all with the air, so that you actually get a homogeneous mixture of gaseous particles and not some liquids, some vapor and some stuff difficult to vaporize anywhere."

In a letter to the Buick Company of February 25, 1916, he says:

"Every atom of the liquid broken up, evaporated, superheated, and thoroughly diffused into a homogeneous condition with all of the air mass, and not have streaks or pockets too rich and some too lean and some areas of air contents with no fuel in it at all."

Incidentally, it seems to have been Deppe's method, in attempting to secure recognition and co-operation for his plans and theories, to consult and correspond with the engineers of various motor companies, and to discuss his problems with considerable frankness, and it was in one of these exchanges with the Oakland Company that Deppe took occasion to say, under date of January 9, 1916,

"Your engineers frankly told me that the sacrifice of volumetric efficiency in their opinion was too serious for me ever to hope to have any works adopt such a heating scheme."

Preservation of volumetric efficiency was the controlling aim, apparently, and the theory that the application of heat to the mixture reduced this efficiency without a contributing quid pro quo bred a prejudice against any such scheme as Deppe was espousing and resulted in the mixture remaining one of divided and nonassimilable parts.

Deppe was first in the art to determine the source of the difficulties attending prior heating means and methods, and likewise he was the first one to devise a means and method whereby heat and volumetric efficiency, theretofore considered inimical, could be reconciled and the advantages of both maintained.

Deppe's aim, therefore, had been, in its first stage, to secure a treatment of gasoline and air which would cause them in their combined form to work equally well in the cylinders of the internal combustion engine irrespective of the quality of the gasoline. This aim in its next step embraced the idea that the proper treatment of the mixture was to reduce all parts thereof to equal dryness. The third and final step lay in the conception of producing the dry homogeneous gasoline and air mixture at a temperature so low that it would not substantially affect volumetric efficiency, and the devising of means and methods for gradually and progressively heating the mixture while mixing the parts in the short interval of time taken for it to travel from the carburetor to the cylinders, to cause a transformation of the several constituent parts into an integrated mixture—a dry, homogeneous, gaseous mixture, being a combination, and yet essentially a new entity.

It is the production of this gaseous mixture and its application to an internal combustion engine which is the essence of the so-called process patent in suit 1,335,665. Prior to his conception of the inventions of the patents in suit, Deppe had been working in the same art, and had apparently appreciated the shortcomings of the so-called wet method. In fact, he had made two applications for patents—the first, filed April 16, 1914, resulting in patent 1,154,617, issued September 28, 1915; the other, filed October 14, 1914, resulting in patent 1,189,797, issued July 4, 1916.

The structures of these two patents were largely similar, the differences being minor, except in one instance, where patent 1,189,797 introduced at the lower end a mechanical agitating device which does not appear in the earlier patent. Patent 1,189,797 makes claim for the production of a dry, gaseous mixture through heating in a single stage, and yet tests of it have demonstrated that Deppe was far from his goal. These tests were of two kinds.

The first and most important was by Deppe himself. He equipped an Overland engine with a device of his patent 1,189,797 and made many tests, including a trip from New York to Toledo in that car. This will be further discussed later herein. Heating the device in the manner prescribed in these prior patents to a degree necessary for complete vaporization in the brief time the passing mixture was subjected to it meant nothing

beyond the production of fractional distillation and cracking, or the production of spheroids and a resultant wet mixture; in other words, there was no appreciable advance toward the desired end, and, on the other hand, the application of a lesser amount of heat also left the mixture wet.

The foregoing process of single-stage heating having proven futile, Deppe seems to have set about experimenting along lines resulting in the inventions of the patents in suit. After driving his Overland, equipped with the device of his patent 1,189,797, to Toledo, Deppe wrote a letter to Lockwood, his patent solicitor, under date of March 5, 1915. This letter gives Deppe's conclusions as to the failure of that device, and also contains a disclosure of the fundamentals of the inventions of the patents in suit. I quote below some excerpts from that letter which are in point:

"I am convinced that there are a number of very subtle things existing in attempting to carburet fuels in the present Otto engines, owing to the short time limits available, far too short in fact for the necessary phases of the liquids in air to be transformed into the real gaseous condition and diffused in the whole air mass, and these things I seem to have ignored too much in dealing with my previous applications which you have already worked up for me in the mixer and heater, the heater alone, and the centrally opening throttle carburetor," etc.

"I too well recognize now that you can have what are in fact wet mixtures because of no outside heat applied to the charges or to the liquid, which remains in part as liquid because of not putting heat enough into the mixture, or wet because of putting too much heat onto the fuels, or putting on heat too suddenly at too high temperatures or too much volume of heat, and making some of the liquid fuels act like water suddenly thrown on a red hot stove. * * *

"Hence it seems to me the only thing one must strive for is to develop ways and means to get the gaseous state of the liquids in the air at the lowest possible ranges by using every available force in nature lending itself to that end, while of course one ought to get as close to the ignition temperatures as possible in producing fuel gases for furnaces and the like, but evidently one must work towards the other end in dealing with high-speed gas engines."

"Hence my idea is to try to utilize the existing devices and means, but co-ordinate them properly to give the necessary sequences, apply the heat gradually to furnish the latent heat of vaporization, make complete vaporization, and then diffuse and superheat the charges, so they will be true homogeneous mixtures; but apparently this must be done at rather limited temperature ranges, say above the ultimate boiling points existing in the operating conditions found necessary, and with the oil to air ratios used, preferably for complete combustion at somewhat higher compressions, but always below the metal or gas temperatures in the temperatures in the generating means that will prevent the troubles of the present arrangements."

In his letter of January 9, 1916, Deppe, writing to the Oakland Company, concerning the Oakland car which had been rigged up with an embodiment of his patent 1,189,797, said in part:

"I was attempting to drive the heat into the charge of the heater just above the carburetor. I found that at times it gave good results, but at other times I apparently got too much heat, and found that I had to lower the compression in the Overland engine, even below the factory basis, which I personally decided was going a step in the wrong direction."

At a later time Deppe had outfitted a Studebaker car with an embodiment of the apparatus patent in suit, and of the workings thereof he has this to say in the same letter to the Oakland Company:

"In my present developments I have adopted what I shall term stage heating and superheat methods, using lower temperatures but at more places in the complete job, and in the Studebaker car I have in New York I certainly have secured a very smooth proposition. It has good miles per gallon, unusually swift getaway, good low speed throttle ability, no knocking, even when using half gasoline and half kerosene, and I can raise the compression also to more than overcome any so-called loss of volumetric efficiency."

Deppe also wrote a letter to the Buick Company on February 25, 1916, wherein he said in part:

"As stated in my conversation with your engineers, you should not confuse my previous efforts to produce a so-called dry gas with my more recent developments, with more heat stages applied within controlled limits, in the carburetors, heaters, if used, and in the act of distribution of the charges through the manifold passages," etc.

"As I frankly told you, I have found that it makes a great difference how you apply heat to the liquid fuels in the air mixtures, and there are very definite limits within which one must work if you are to avoid critical temperatures. * * * You simply cannot

throw liquids against metals so hot as to make some of the liquid fuels act like water suddenly thrown on a red hot stove. * * * Again you simply must not apply heat enough to dissociate or break down the liquid molecules, either as liquids or gases. * * *

"My improved methods produce homogeneous gaseous mixtures of somewhat lower temperatures than engineers realize now possible, even with much heavier fuels than now being handled by our oil friends, and I can also now raise compression over present standards; whereas, I had to lower that in my prior efforts of applying the heat in an attempt to produce a superheated homogeneous dry gaseous mixture before entering the cylinders. * * * You may still maintain that the only amount of heat you will favor now is enough to take the chill off of things," etc. "You may think that what you call volumetric efficiency must not be sacrificed. * * *

"I prefer not to state exact temperature limits necessary in the mixtures in my improved methods now, because the boiling points in the liquid oils in air, as they exist in the limits of the intake and motors, are affected by the oil to air ratios used, by the way you apply the heat, the degree of diffusion means applied to hasten evaporation processes, etc., also will vary as to what methods are used in the refinery, from what kind of crudes the refined products are made, etc. Text-book formulæ indicate, however, that the boiling point ranges one must overcome in my new methods of stage heating effective diffusion means, etc., will be somewhere between say 100° F. and up to 160° F., or even slightly higher, if the refiners find no means of cracking kerosenes into lighter fraction stuff to blend. * * *

"Superheat above the highest boiling points involved must be enough to prevent condensation in the cylinders from any cause. One must certainly have every atom of the liquid broken up, evaporated, superheated and thoroughly diffused into a homogeneous condition with all of the air mass, and not have streaks or pockets too rich and some too lean, and some areas of air contents with no fuel in it at all," etc. "You should stay within high and low heat limits to have no wetness on manifolds, or sticky stuff in valve chambers," etc.

"Oil refiners claim to me that one must not go up to 400° F. in metals against which you expect to throw oil fuels, unless you will have what they term cracking or results similar to water thrown on a red hot stove, and some claim such a result comes to tiny droplets of liquids in air too hot for complete evaporation in intake passages," etc. "Therefore it appears absolutely vital to me now to get enough heat into the mixture to do the trick of producing a homogeneous mixture under all conditions, but it is also certain, as I see it now, that one must keep temperatures within the limits of the highest boiling points involved in the air mixtures in intake systems, and avoid the things the oil men talk about to me, as liable to happen anywhere when too much heat, too suddenly, at too high a temperature, is applied to any hydrocarbons. * * *

"The more stages you put into effect the lower the maximum temperatures required at all points, and the lower you can develop the superheated homogeneous state of affairs, the leaner the mixtures, and the higher the compressions possible to use even in what you now term as degraded fuels. If for the sake of argument you really are opposed to heating the air to avoid lost volumetric efficiency, I feel one can make it up by adding equivalent heat stages after the carburetor. But heating the air somewhat, heating the carburetor metals somewhat, and staging up the temperatures through from the carburetor to the inlet valves, will give the best results, allow the heat the most time to do its work on the liquids, complete diffusion, insure a homogeneous mixture at all times. * * * I wish you could see your way clear to really take up this matter with me in dead earnest, and let me work out a test car in your works."

Under date of March 15, 1916, Deppe wrote a letter of largely similar import to the General Motors Truck Company and said in conclusion:

"I shall be glad to furnish at my own expense all the necessary equipment to develop my methods in one of your trucks, and I can use one of your manifolds, or will have one made at my expense, if I find that cannot be done, whenever you are prepared to let me have a try-out on your own product, as I realize that trucks do have points of difficulty not existing in passenger cars," etc.

It was after these efforts to interest various motor companies in his proposals had proven futile that Deppe applied for the patents in suit; the application for the process patent being filed August 3, 1917, and that for the apparatus patent on April 20, 1917. An inspection of the claims and specifications of these patents serves to confirm the idea that they are in their form and substance the fulfillment of the theories and disclosures advanced in the letters already quoted and referred to.

In his process patent Deppe says that the

object thereof "is to prepare a fuel mixture gas from liquid hydrocarbons mixed with air preferably at high temperature and thoroughly integrated to produce a substantially stable gas which upon introduction into the cylinders of an internal combustion engine will remain in gaseous form." Page 1, line 14 et seq. "When a gaseous mixture is produced by my method, it is so perfectly integrated and superheated to such an extent that upon the introduction into the cylinder even though expanded in the process, it remains gaseous so that in the compression stroke it will behave as a perfect gas and become still more highly heated by compression * * * without the danger of preignition." Page 1, line 79 et seq.

And as giving an indication of Deppe's conception of the proper temperature to be employed in effecting the desired mixture, reference to his apparatus patent discloses him as speaking of a temperature "not high enough to break down the molecular structure of the fuel mixture or to cause preignition." Page 4, line 96 et seq.

He also proclaims against a temperature which will cause "dissociation or breaking down of the several liquid molecules" (page 4, line 7 et seq.), and in favor of one producing a mixture which "will remain gaseous throughout the intake and compression strokes and will fire completely when the ignition spark is applied" (page 3, line 104 et seq.).

The process patent furthers this idea in its claims 16, 25 to 30, and 32 to 35, for therein it is provided that, after compression, the temperature of the mixture shall still be "just below the point of automatic ignition." But as compared with the temperatures obtaining in the wet mixture methods largely in vogue at the time, Deppe did call for an essentially higher temperature, one which would serve not only to reach the saturation point, but would superheat the mixture sufficiently beyond that point to insure against liquefaction as the result of any slight cooling which might occur.

This danger he expresses in his process patent as follows:

"It is well known that, if a gas is compressed, the temperature of the gas is raised, while, if a gas is permitted to expand, it will take up heat from surrounding bodies or its temperature will fall. If a gas of this character is near the saturation point, liquid particles will be deposited when slightly cooled." Page 1, line 72 et seq.

In short, the maximum heat allowable shall yet be sufficiently moderate to insure against premature explosion of the mixture, while the minimum heat shall be capable of producing a temperature in the mixture somewhat higher than the saturation point, to insure against liquefaction or wetness through any appreciable cooling, and furthermore the heat between these two limits must be so applied as to produce the integration desired while the mixture is passing from the carburetor to the cylinder.

As shown by the patents, this supplying of heat comes through the utilization of the hot gases from the exhaust manifold and their application at three points in the intake manifold: First, just above the carburetor; second, at a halfway point between carburetor and cylinder; and, third, close to the cylinder ports.

The means for agitating the mixture are also shown in the patents. The agitation is the work of a mechanical mixer, takes place coincidentally with the first rise in temperature, and serves the purpose, through a kneading process, of breaking up and atomizing the fuel particles for their easier and more complete heating, and consequent complete gasification.

But concerning the means of agitation Deppe says in his process patent:

"In carrying out my method, it is obvious that various forms of apparatus may be utilized, and it will be understood that I do not wish to be limited to any particular device or apparatus." Page 2, line 55 et seq.

The apparatus patent at page 2, line 45, as well as at page 4, line 121, expresses a like unwillingness to be bound by any specific mechanism. The two respects in which Deppe's processes and patents branched out from previous practices and usages were, first, in the production of a mixture of air and low-grade gasoline, integrated through the co-ordinate application of heat and agitation; and, second, in the utilization of such product for the functioning of an internal combustion engine. Each of these advances appears in the language of various claims in the patents.

Claim 10 of the process patent, in referring to the co-ordination of heat with the mixture under agitation, speaks of the process as "highly heating the mixture at predetermined successive stages to progressively raise the temperature of the mixture above the boiling points of the liquid fuels, whereby a homogeneous dry gaseous mixture in a superheated state is produced, adapted to maintain itself as such during and after delivery to the heat or power unit."

Claim 15 of the apparatus patent speaks

of "utilizing the products of combustion for simultaneously and progressively raising the temperature of the mixture throughout the mass, the relative dimensions of the parts and the distribution of the heat being proportioned and co-ordinated as to develop temperatures throughout the mass of the fuel mixture such as to produce, maintain, and deliver to the combustion chamber a mixture having the properties of a homogeneous dry gas."

In passing, and in connection with the use of the phrase "above the boiling point of the liquid fuels," the following excerpt from the letter written by Deppe to the Buick Company, in February, 1916, is a further and somewhat more specific indication of his ideas on the subject at that time:

"As I frankly told you all, I prefer not to state exact temperature limits necessary in the mixtures in my improved methods now because the boiling points in the liquid oils in air as they exist in the limits of the intake and motors are affected by the oil to air ratios used, by the way you apply heat, the degree of diffusion means applied to hasten evaporation processes, etc., also will vary as to what methods are used in the refinery, from what kind of crudes the refined products are made, etc. Text-book formulæ indicate, however, that the boiling point stages one must overcome in my new methods of stage heating effective diffusion means, etc., will be somewhere between say 100° F. and up to 160° F. or even slightly higher."

Deppe's solution of the fuel problem and the means of bringing it about lay in the making of a dry homogeneous gas from the available low-grade fuels, and producing with them, through the co-operating mediums of air, progressive heat, and agitation, a combustion so nearly perfect and possessed of such power as to overcome all the loss of volumetric efficiency which resulted from heating the mixture. Paradoxical though it appears, it is seemingly the truth that the process above outlined is greatly helped, so far as the needful amount of heat is concerned, by the very complexity of the mixture; for with so diversified a mixture the degree of heat answering the description "above the boiling points of the liquid fuels" is not, of necessity, pronouncedly high.

The only thing that will keep a liquid from evaporating is the pressure of its own vapor, and therefore it is immaterial as to how many vapors of other substances may be present; the evaporation or nonevaporation of any one component part depends upon the presence or absence of its own vapor. The greater the number of constituent parts in a mixture, the smaller is the proportion of any one of them therein, and so much less is the pressure of its own vapor. With this lessened pressure condition existent through the hybrid mixture, so long as all the fuel was kept mixed with all the air, by so much was lessened the temperature at which evaporation took place.

And in this connection Deppe's system of progressive heating plays its important part, in that it gives to each particle of liquid spray and air whirling through the intake manifold system an injection of heat, which it carries along and imparts to a degree to other like particles, to the end that the entire mixture is heated in minimum time. At the same time the spray particles are kept evaporating in an atmosphere of all of their constituents, with a consequent lessening of the vapor pressure on them. It is this whirling, heating treatment, administered to the component parts, which beats and fuses them, so to speak, into a combined entity, new and yet containing all the constituents of the liquid fuels, and which Deppe describes as the "integration" of the mixture, and which one of the experts refers to as "the summation of all of the spray and liquid and air into one uniform mixture."

In view of the foregoing representations regarding needful heat, as the same appear in letters and in patent claims, and which, as I read them, appear to declare for heat in comparative moderation, described variously as heating the mixture to a "point below that of automatic ignition," "above the boiling point of the liquid fuels," "somewhere between say 100° F. and up to 160° F., or even slightly higher," etc. it is worthy of note that the file contents of the apparatus patent in suit, the so-called abandoned application, and the British patent contain statements upon the subject of heat which are wholly at variance with the ideas expressed in the quotations, and call for excessively high temperatures.

These statements are those of Mr. Deppe's patent solicitor, and in the main are as follows:

"When the mixture reaches the intake of the engine, it will have a temperature considerably above 600 degrees, which is the boiling point of kerosene" (letter of October 16, 1918, in the file of the process patent).

"It has been found that the ignition temperature is somewhere in the neighborhood of 1200°, and the superheated dry gas delivered by applicant's apparatus is under normal conditions slightly below this temperature" (from the same letter).

"Superheated to a temperature slightly below the ignition point of the mixture, then introducing the highly heated gaseous mixture into the cylinder" (from the specification of the so-called abandoned application).

It is these statements which evoked from Mr. Swinburne, noted British authority on internal combustion engines, the following, during the course of his testimony:

"I have read enough from the file wrappers, which show conclusively that Deppe put forward his temperature as being of the order of 1000 degrees Fahrenheit." Defendant's Record, p. 37.

While reference to this variance seems appropriate at this point, discussion thereof will appear later herein.

Having set forth with some particularity the inventions which Deppe made, as I see them, it appears to me that they differ from all of the prior art set up in this case, including the alleged prior public uses. The Deppe prior patent, 1,189,797, has been already discussed and distinguished, and will receive no further attention, except to say of it that Mr. Swinburne, defendant's expert, seems to have named it as constituting, in the prior art, the nearest approach to the patents in suit.

It does not appear necessary or advisable in view of Mr. Swinburne's classification, to discuss in detail all the other patents and publications put forward by the defendant. I have examined with care, not only these patents and publications, but also the testimony and arguments relating thereto, and, as a result thereof, am unable to find in the prior art any anticipation of the inventions in suit, or any disclosures from which one, skilled in the art though he may have been, could have arrived at either of the patents in suit without the aid of a high degree of inventive artistry.

In many instances the devices urged have to do with the employment of kerosene, not being adapted, without essential modification or change, for the mixing and integration of a low grade of gasoline, and therefore making reference thereto futile as constituting anticipation. "It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions." Topliff v. Topliff, 145 U. S. 161, 12 S. Ct. 828, 36 L. Ed. 658.

This eliminates, as being within such category, the following references of defendant, wherein it would appear that, if gasoline is anywhere mentioned, it is as a starting agency only: Anderson, automobile, Baxter, Butler, Dawson, D'Ivernois, Eveno, Griffin, Jahrbuch, Motor Age, motor boat of 1905, motor ship, Mowbray, Perkins, Pierce, Quast, Schulz, Scripps, and Thomas.

One great shortcoming in the prior art lay in the failure to discover the specific source of the fuel trouble; and while the art as cited contains many disclosures of means and methods for heating fuel for automotive engines, the fact that the workers and inventors therein had failed to determine the source of the trouble, its nature, and the reason for its being, leads to the inevitable conclusion in fact that they had likewise failed to find method, process, or means for its solution.

When Deppe began his experimentation and invention, the gasoline engine art had already progressed to the point where it was essentially different from the kerosene engine art, both as to its problems and the methods necessary for its furtherance and improvement, and it was becoming more and more evident that future developments in each art would progress along separate lines, rather than that builders should look to the kerosene motor art for any improvement of gasoline engines, or vice versa. In view of this situation, it appears to me that kerosene motor references cannot be considered as constituting any solution of the gasoline engine's problem.

A great number of references were produced by the defendant, but from the list submitted, exclusive of Deppe's own prior patent, 1,189,797, already referred to as perhaps the nearest approach to the patents in suit, the only gasoline motors, with the exception of those in which gasoline served merely as a means of starting, were the following: Exhibit A 17, Motor Traffic; Exhibit A 20, Motor World; Exhibit A 21, motor, May, 1910; Exhibit A 27, Sykora, 1,099,271; Exhibit A 28, motor boat; Exhibit A 31, Lucke & Good, 1,345,378; Exhibit A 35, Berges, 372,092 (French patent).

The Sykora patent, No. 1,099,271, was the subject of much discussion, and strongly relied on by the defendant as embodying the vital elements of the Deppe idea. While it treats of the application of heat to the mixture, I am unable to find therein that there was any thought of drying the mixture through the heating agency, or of heating the mixture progressively or by stages, or of any co-ordination of agitation and temperature to produce integration; and while defendant's expert, in speaking of a Sykora apparatus constructed and tested by defendant for the purpose of showing the Deppe result,

says: "The whole thing is under complete control. It is quite competent to give any of the heat effects used by the plaintiffs or by any other motor makers in ordinary practice"—he says nothing about the heat effects disclosed by Sykora.

As Sykora's patent must be interpreted from its own disclosures, the absence of disclosures showing anticipation of Deppe's ideas forbids the utilization of Sykora's structure for that purpose, even if a proper proportioning of his various passages might produce a dry mixture. It is to be borne in mind in this connection that the Deppe invention was at the outset an idea, and that a physical embodiment of that idea followed. In my opinion, Deppe's correspondence strongly substantiates this as the statement of facts, and nowhere do I find any earlier expression of that idea.

[1] Therefore, and as most of the claims in issue are process claims, it follows, as already said, that the showing of an earlier apparatus, which might carry out the process, cannot constitute anticipation, unless accompanied with directions in the patent for the same. "A process patent can only be anticipated by a similar process. It is not sufficient to show a piece of mechanism by which the process might have been performed." Carnegie v. Cambria, 185 U. S. 424, 22 S. Ct. 707, 46 L. Ed. 968.

Defendant's Exhibit A 138 consists of a series of sketches designed to show the progress of development of the Buick motor. From these sketches it appears that these motors in production prior to 1916 had one point of heat application only, being located next to and above the carburetor.

Of sketch No. 4 it is said that it was approved for production in the spring of 1915, and this sketch also shows heat applied at one added spot only, but this time at the junction of the manifold branches. Despite approval, the form shown in sketch 4 was abandoned before any production occurred, and production of the form shown in sketch 5 began May 28, 1915, and of the form shown in sketch 6 in October, 1915.

Neither of the forms shown in sketches 5 and 6 contains the provision of sketch 4 for the application of heat at the junction of the manifold branches, which had apparently been discarded, nor is there anything in the record from which it might be found that a structure such as shown in sketch 4 would have embodied Deppe's mode of operation or accomplished his result. There is no basis either for such a finding regarding the structure shown in sketch 4, in the assertion that

the Oakland Company as early as July 24, 1915, had on sale a structure similar to sketch 4, and appearing in the sketch on Exhibit A 86, sheet 2, for of this construction defendant's witness Hutchinson, making tests with aviation gasoline, says: "I ran that engine on the block at speeds corresponding to car speeds in the neighborhood of 10, 20, 30, and 40 miles an hour, and found that the mixture did not dry out until we got to speeds around 40 miles an hour." This structure palpably did not have Deppe's mode of operation, and equally clear is it, from the foregoing statement of Hutchinson, that it failed to produce the result called for by Deppe.

Referring now specifically to the patents in suit, even at the expense of some possible repetition, chronologically the process patent, 1,335,665, comes first. At page 1, line 14 thereof, et seq., is set forth the object of the invention, already quoted herein. This object and its aims are contrasted with the so-called wet mixture method theretofore obtaining, and, after setting forth some of the difficulties resulting from that method, Deppe says of his own resulting mixture that "the mixture has been developed and integrated into a substantially uniform and homogeneous superheated dry gas, which will remain in this state during and after introduction into the cylinders."

In line 79 et seq., he says: "When a gaseous mixture is produced by my method, it is so perfectly integrated and superheated to such an extent that upon introduction into the cylinder, even though expanded in the process, it remains gaseous, so that in the compression stroke it will behave as a perfect gas and become still more highly heated by compression."

At page 2, line 46 et seq., it says concerning the method: "This treatment of the fuel mixture has the effect of completely gasifying and integrating the mixture; the last stage of heating being adapted to superheat the gaseous mixture the constituent elements of which have become gaseous, sufficiently to maintain it as such until it is used in the cylinders of the engine or in other suitable combustion chamber."

Page 2, line 55 et seq., contains the following: "In carrying out my method, it is obvious that various forms of apparatus may be utilized, and it will be understood that I do not wish to be limited to any particular device or apparatus." There is also pictured and described an apparatus by which the method for producing the mixture above specified may be carried out.

With no ambiguity, but clearly and com-

pletely, the patent sets forth the result sought to be accomplished, as well as a method and means for accomplishing it, and when are realized the numerous and wide variations appearing in the different engines to which the invention is sought to be applied, and also the variable conditions resulting from the diverse assortment of fuels to be treated, the disclosures as well as the directions of the patent must be taken as being to those skilled in the art, full, accurate, and complete. Minerals Separation Co. v. Hyde, 242 U. S. 270, 37 S. Ct. 82, 61 L. Ed. 286; Eibel v. Paper Co., 261 U. S. 65, 43 S. Ct. 322, 67 L. Ed. 523.

The cautions as to the limits of temperature have already been referred to; on page 1, line 90, the temperature to be so low as to be "without danger of preignition," and on the same page, at lines 69 and 84, high enough to produce a "dry, homogeneous gaseous mixture." In the same vein are the cautions set out in claims 16, 25 to 30, and 32 to 35, stating that after compression the mixture shall be "just below the point of automatic ignition." Designed obviously for reception by those skilled in the art, the foregoing terms are illuminative and directory to a pronounced degree.

The apparatus patent, 1,360,098, in addition to setting forth in detail suitable apparatus, contains also a full disclosure of the process, accompanied with the same cautions regarding temperature as contained in the process patent, albeit expressed somewhat differently. This patent, at page 4, line 96, in speaking of the temperature, says that it is "not high enough to break down the molecular structure or to cause preignition," but high enough so that the mixture "will remain gaseous throughout the intake and compression strokes and will fire completely when the ignition spark is applied" (page 3, line 104). These high and low limits, it appears to me, are well covered by plaintiffs' expert, Waterman, in response to R. D. Q. 225, page 683 of plaintiffs' record.

My examination of the prior art convinces me that the patents in suit set forth a fundamentally new conception of the treatment of air and fuel mixtures for gasoline engines, for nowhere do I find in any disclosure of prior art patents or literature the underlying principle of these inventions, the idea of providing means for such a co-ordination of temperature with agitation as to integrate the gaseous constituents, so as to produce a dry, homogeneous gas, containing all the fuel constituents of a low-grade gasoline fuel or hybrid mixture.

Deppe, so far as the record shows, was the first to produce a homogeneous, dry gas, containing all the original fuel constituents, and at a temperature sufficiently low to preserve volumetric efficiency practically inviolate, and yet high enough to insure against substantial condensation of the fuel upon introduction into the cylinder. Prof. Stevenson, one of plaintiffs' experts, has offered his scientific explanation of the laws upon which Deppe's idea is based (beginning at page 693 of plaintiffs' record), and while its exhaustiveness and complexity make large quotations therefrom impracticable, I may say that a careful study of it has convinced me of the soundness of Deppe's aim and the processes designed for its attainment. This testimony is substantially uncontradicted.

As an expert, he first discusses the inexactitude of calling the temperature of water boiling under a pressure of 760 mm. of mercury, or one atmosphere "the boiling point," because of the presence of two errors in such a designation. One of these errors is that such point is not a precise one, water boiling at varying degrees under different conditions. He suggests the avoidance of such error in the statement that the ordinary boiling point of pure water is 212 degrees F., at which the vapor pressure is one atmosphere, or 760 mm. of mercury. This point is precise, being the point of equilibrium between liquid water and water vapor, and this point of equilibrium is so delicately poised that the increase in temperature required to cause evaporation or the decrease required to cause condensation is smaller than any measurable fraction of a degree of temperature, and from this it follows that the dew point, or condensation point, and the boiling point at 760 mm. are the same temperature.

The second error lies in the use of the term "boiling point" to signify the equilibrium between water and vapor exclusively at the pressure of one atmosphere, because water and its vapor may be in equilibrium over a range of pressures. These boiling points not only vary with the pressure, but also with the concentration of liquid components, becoming higher as the solution evaporates.

After discussion of the treatment of water and alcohol in solution to the point of complete evaporation of the component parts at a temperature inferior to the boiling point of the highest boiling constituents, he says that, while he had studied these matters, it has always been with the thought that advantage lay in the separation of the constituent parts, and not in entire evaporation and integration, the apparent advantages of which first surprised and then convinced him.

Quoting Raoult's law as follows: "The vapor pressure of each component of a solution at equilibrium is equal to its vapor pressure if alone multiplied by its molal fraction" —and Henry's law, "Any chemical substance present as a perfect gas in a vapor phase and as a solute in a perfect solution in equilibrium with it has in a definite temperature a molaity or molal concentration, $C$, in the solution which is proportional to its (partial) pressure, $P$, in the gaseous phase," he discusses the manner in which a gasoline solution changes in composition and in boiling points, while it vaporizes in equilibrium with all of its vapor.

Pursuing this process step by step, and calling attention to the fact that the point of equilibrium is the more speedily attained by agitation of the gas and the liquid, he traces the temperature of the system, increased in successive stages, and attaining complete equilibrium at each temperature; and in this progression he obtains a series of increasing boiling points of the gasoline solution, each boiling point being the same as the dew point of the vapor or gas in equilibrium with the particular liquid, until eventually there remains but one droplet, which is in equilibrium with all the gas that is given off.

He further finds consonant with the principles of the laws of Raoult and Henry that, if this droplet is really in equilibrium with all of the vapor, it will not therefore be the pure chemical compound of highest individual boiling point that existed in the original gasoline, but as complex a solution as the liquid was at the start, consisting of all the chemical individuals that were present originally, but in different relative proportions; and the temperature at which gasoline is completely vaporized under equilibrium conditions he designates as the equilibrium end point, that being the definite expression of complete volatility of all of the gasoline in its vaporization under the best possible conditions.

And concerning the variation of dew points or equilibrium points with the pressure when air is mixed with the gasoline, he states that the pressure is not the total pressure of air plus the gasoline, but the partial pressures of the gaseous gasoline; that part which is due solely to the gaseous gasoline. Referring to Dalton's law, and quoting it as follows:

"(1) The pressure exerted by and the quantity of a vapor which saturates a given space are the same for the same temperature, whether this space is filled by a gas or is a vacuum.

"(2) The pressure exerted by mixture of gas and a vapor, of two vapors, or two gases is equal to the sum of the pressures which each would exert if it occupied the same space alone"

—and illustrating his conclusions in terms of a curve, he finds both from Dalton's law and from experience that the curve of dew points at different pressures is the curve for the equilibrium end points of gasoline mixed with air, and further that, irrespective of the absence of air or its presence in any proportion, this identity of curves is maintained, showing that the presence of air has no effect on the dew point.

Paying particular attention to that portion of the curve which includes the concentrations within the range of automobile operation, he finds that such range extends approximately from 11 mm. partial pressure to 25 mm. partial pressure of gasoline vapor, which corresponds to a temperature of the dew points of from 111 to 154 degrees for Socony gasoline of November, 1923. He states that in automobile practice concentrations of gaseous gasoline are expressed generally as ratios of gasoline to air, expressed variously as ratio by weight and ratio by volume, and refers likewise to them in terms of curves; both of the curves being for variation of the dew points with the concentration of gasoline vapor, and both being equilibrium end points. They represent the temperature of true equilibrium, where the dew points of complete gasoline vapor are the same as the corresponding boiling points of the very last portion of the gasoline that evaporates under equilibrium conditions.

Calling attention to the fact that evaporation under these equilibrium conditions has become difficult, both because there is a large volume for a little gasoline to occupy, and because the air present largely retards the accomplishment of equilibrium, he finds it imperative that the liquid gasoline be heated at the same time it is intimately mixed with all of its vapor by stirring and agitation. His argument for the successive stage heating is that the equilibrium between the liquid and all of its vapor can be reached after each stage before further heating, and a longer time is offered for the attainment of equilibrium.

The result of proper treatment for evaporation under equilibrium conditions is a gasoline entirely vaporized at a minimum temperature of about 111 degrees, dry, homogeneous, uniform, and unstratified, and ready for perfect distribution for use. Mr. Waterman, another one of plaintiffs' experts, also explains the Deppe idea and applies it to the engine problem as follows:

"The problem which Deppe solved was the

making of a dry homogeneous gas from these hybrid and complex low-grade fuels, and he accomplished this result by making the very complexity and hybridity, which was the cause of the difficulty, the way of curing it; and he also, by heating properly, produced enough power from perfect combustion, to substantially overcome all loss resulting from the warming of the mixture. In other words, he overcame the volumetric efficiency difficulty more effectively while getting a perfectly combustible mixture. Deppe's cure consisted, as set forth in the patent in suit, in evaporating the liquid fuel in the presence of its own vapors, while progressively heating the mixture, and intimately mixing it. He did this at temperature high enough to effect evaporation, and in his preferred form, and as described, he progressively increases those temperatures as the fuels are able to bear the increase, but not high enough to produce spheroidal condition or to decompose the fuel, or to materially affect the volumetric efficiency of the engine. By carrying the fuel and its vapors along together and keeping them sufficiently in contact with one another and with the air, he produced a dry and superheated gas, even in the very short time available." Plaintiffs' Record, p. 50.

Dr. Grosvenor performs a like service, with special reference to the necessary limits in temperature. Plaintiffs' Record, pp. 747, 748.

It is the contention of the defendant, on the one hand, that the patents in suit are nothing more than specific improvements, and that the claims should therefore be limited strictly to such species, and, on the other, that these patents, because of the illustrative embodiments of apparatus shown, are limited to a mechanical whirligig and to alternate round and flattened portions of the manifold.

[2] To me there is much more in these patents than the defendant urges, and for the reasons above set forth I conclude that, where there is a new principle involved, as I believe is here the case, the patentee is not to be limited to the exact apparatus shown and described, but is entitled to an interpretation of his claims broad enough to secure to him the real value of the contribution which he has made to the art. Eibel Co. v. Paper Co., 261 U. S. 63, 43 S. Ct. 322, 67 L. Ed. 523.

[3] Now for a consideration of the claims in issue. In the method or process patent we may divide the claims into two broad classes: The first, that of preparing the explosive mixture; and, the second, that of operating internal combustion engines. Claim 10 is the only one of those in issue belonging to the first class. To the second class belong the other claims, 16, 25, 26, 27, 28, 29, 33, 34, and 35. With the exception of claims 16 and 25, all the others of the second class convey the idea of preparing the mixture by the use of such expressions as "preparing exteriorly of the combustion chamber thereof, a mixture of air and hydrocarbon" (26, 29), "mixtures of liquid hydrocarbons and air transformed * * *" (27, 28, 33, 35), and "consists in transforming predetermined proportions of hydrocarbons and air * * *" (34).

In all the claims of the second class, whether specifically mentioned or not, it appears to me evident that the mixture is prepared in accordance with the process described in the specification. The novel features of invention with which they must therefore be credited are, first, the production of an integrated mixture of air with low grade or hybrid gasoline and the novel co-ordination of heat with the mixture under agitation; and, second, the application to an internal combustion engine of the integrated mixture so produced.

Since, in my opinion, both of these features are novel, and are the subject of certain of the claims, I deem such claims to be valid, and so hold. Claim 10 of the process patent includes the novelty first above mentioned, while claims 16 and 25 include the second. Claims 26, 27, 28, 29, 33, 34, and 35 include them both. All of the claims in issue contain some reference to the lower limit of the temperature; claim 10 expressing it as being "above the boiling point of the liquid fuels," while the expression in claims 16, 25, 26, 27, 28, 29, 33, 34, and 35 is "above the boiling points of the fuel constituents."

[4] Claims 16 and 17 of the apparatus patent contain novelty in their statement of means "for homogeneously and progressively heating the mixture throughout and raising its temperature above the boiling points of the fuel constituents." Claim 15 of this patent is discussed elsewhere.

As I read them, Deppe has clearly set forth his invention in all the claims in suit. Referring to the claims which were used as examples at the trial, the following from claim 10 expresses the result: "A homogeneous dry gaseous mixture in a superheated state is produced, adapted to maintain itself as such during and after delivery to the heat or power unit."

This from claim 26: "A mixture of air and hydrocarbon in the form of and having the properties of a homogeneous fixed dry gas."

The expression in claim 29 is: "A homogeneous mixture having the properties of a dry fixed gas." While claim 35 says: "When introduced into the cylinder of the engine and compressed will remain dry and fixed, retaining the molecular and chemical properties of a homogeneous dry explosive gas mixture of uniform density throughout."

Claim 15 of the apparatus patent speaks of it as: "A mixture having the properties of a homogeneous dry gas." The method of obtaining this new mixture is also expressed in the claims, as the following will show:

Claim 10 says: "Charging a moving stream of highly heated air with liquid fuel spray, metering the flow, mechanically break-up and diffusing the mixture while applying heat, thereby producing vapor and wet gas, then highly heating the mixture at predetermined successive stages to progressively raise the temperature of the mixture above the boiling points of the liquid fuels."

Claim 29 says: "Mixing spray of liquid fuel hydrocarbons with highly heated air, then churning and kneading the mixture column while progressively heating the same, the mixture, after passing through successive stages of mist, fog, and invisible vapor as its temperature is raised step by step."

Claim 35 expresses it thus: "By properly proportioning the passage, through which the mixture is conducted, in the metering and heating means, and the combustion chamber and the passages conducting and applying the heating fluid to the mixture passages, as to shape, cross-section, thickness, and length, with heat applied progressively at increasing temperatures in the mixture until the temperature of the mixture is above the boiling points of the fuel constituents."

While claim 15 of the apparatus patent says: "Provided with jackets and pipe connections for utilizing the products of combustion for simultaneously and progressively raising the temperature of the mixture throughout the mass, the relative dimensions of the parts and the distribution of the heat being so proportioned and co-ordinated as to develop temperatures throughout the mass of the fuel mixture such as to produce, maintain and deliver," et seq.

It is insisted by defendant that Deppe's invention as above explained fails of expression in the claims of the process patent by reason of the statements therein contained, concerning the temperature of the mixture, that it is raised "above the boiling points of the liquid fuels," as claim 10 expresses it, or "above the boiling points of the fuel constituents," as set forth in claims 26, 29, and 35.

It appears to me that the defendant has fallen into error in connection with this contention, and that the error lies in its failure properly to interpret the words "boiling point."

As I have examined the use of this term, it appears to me a clear expression, and one which, to a man skilled in the art, is freed from ambiguity; due regard being had for the conditions under which the mixture exists in its passage through the manifold. The testimony of the experts already referred to is all to the effect that the boiling point referred to is the partial pressure boiling point, and interpretation of the claims upon this hypothesis frees them from doubt or ambiguity. [5] Another contention of defendant, as heretofore suggested, has to do with the contents of the file wrapper, and is to the effect that they are opposed to interpreting the words "boiling point" as meaning the partial pressure boiling point. As I have already indicated, it appears to me that the language of the patents in suit is free of ambiguities to the reader skilled in the art, and, such being the case, there is no need of resorting to the file wrapper for an interpretation of these disputed words and their meaning. And, again, it appears that these words were not inserted by amendment to overcome an examiner's rejection, but were contained in claim 10 of the method application as originally filed August 3, 1917, and which reads as follows:

"10. The method of preparing an explosive mixture for combustion in heat and power units, which consists in charging a moving stream of highly heated air with liquid fuel spray, metering the flow, mechanically breaking up and diffusing the mixture while applying heat, thereby producing vapor and wet gas, then highly heating the mixture in progressive stages to temperatures above the boiling points of the liquid fuels, whereby a dry gaseous mixture in a superheated state is produced, adapted to maintain itself as a dry gas during and after delivery to the heat or power unit."

[6] As excerpts already quoted show, Deppe's patent solicitor made statements in letters which, if they could in any wise be accepted as dispositive, would, without doubt, establish a temperature so high as to be out of all reason, and put Deppe's patents beyond the possibility of successful illustration or operation. And it is upon the statements of these letters as well as upon said solicitor's arguments of like tenor before the examiner that defendant relies largely in its contention relative to the contents of the file wrapper. In fact, defendant's expert admits that the

apparatus illustrated in the patents in suit is incapable of producing any such temperature.

To me, however, the whole history of Deppe's doings, including experiments, letters, disclosures, claims, and specifications, show an essentially different conception, and therefore, and for the reasons above set forth, I am unable to agree with the defendant that any estoppel has arisen by reason of the arguments of the patent solicitor. Westinghouse v. Condit, 194 F. 427, 114 C. C. A. 389; Spalding v. Wanamaker, 256 F. 533, 167 C. C. A. 602; Baltzley v. Spengler (C. C. A.) 262 F. 426.

And even if these arguments appearing in the file contents were admissible, these same contents would also show that, at the time the examiner allowed the application, his mind and that of the applicant were in agreement upon the partial pressure interpretation of the expression "boiling point," as may be gathered from the language of the applicant's letter, bearing date March 1, 1919 (in the abandoned application, from which many of the claims in issue in the process patent came), as follows: "This handling of the mixture seems to automatically reduce the boiling point of the oil constituents."

His letter of November 20, 1919, also contains these two phrases: "Breaking up and diffusing oil fuel in air lowers the boiling point, and increases evaporation." "Lowers boiling point of liquids, while automatically carrying the mixture in mass to high temperature."

Two forms of infringement are presented by the record in machines sold prior to the commencement of suit, known respectively as the Buick 1922 model and the General Motors truck 1922 model, both of which operate in accordance with the idea which Deppe was first to advance.

In defendant's catalogue (Plaintiffs' Ex. 46, p. 9), issued prior to commencement of suit, appears the following: "To make certain that every drop is vaporized before entering the valve chambers, the manifold has been designed to superheat the mixture at the point where the mixture is divided to pass into the various cylinders."

These structures are represented in the case both by drawings, Exhibits 14 and 15, and by the specimen structures, Exhibits 16 and 17. As illustrative of the fact that these constructions conform to the language of the patents in suit, an examination of them both clearly shows provision for "mechanically breaking up and diffusing the mixture while applying heat," as well as for "highly heating the mixture at predetermined successive

15 F.(2d)—28

stages to progressively raise the temperature of the mixture."

In the Buick 1922 model one stage of the heating is provided for by a jacket immediately above the carburetor. Another heating stage begins at or near the junction of the manifold branches and extends a substantial distance along each branch, the intake manifold and the exhaust manifold being separated by one thirty-second of an inch. This means of progressive heating, combined with the provision and means adopted for agitation of the mixture, appear to me to show, not only an intention to attain the Deppe mode of operation, but the successful accomplishment of that result.

The same may be said of the General Motors truck 1922 model, in which one heating stage extends the entire length of the vertical part of the manifold and to a second heating stage, which extends from that point to and beyond the junction. In the second stage the heat is provided through the common wall between the exhaust and intake manifolds.

Concerning agitation of the mixture, I am convinced that in both the Buick and the truck the equivalent of the agitation referred to in the claims in suit is secured in the fact of the mixture being drawn with extreme rapidity from one port to the other, flowing as it does at a rate approximately a mile a minute and being constantly baffled or deflected by the presence of the valve. This activity of the mixture, co-ordinated with the progressive heating already noted, is productive of the desired integration. The tests show that these two structures under all ordinary conditions produce the Deppe result of a dry, homogeneous mixture of air and the whole fuel in gaseous form, in accordance with the process claims by utilizing the Deppe means of the apparatus claims of co-ordinated agitation with progressive raising of the temperature to the required amount to maintain the mixture in gaseous condition until ignited.

In my opinion the tests made by plaintiffs' witnesses of the Buick 1922 model confirm these conclusions, having been maintained under all ordinary road conditions, and showing that under such conditions this 1922 model produces, maintains, and delivers to the engine cylinder a dry, superheated, homogeneous, gaseous mixture throughout all the various conditions to which an automobile is ordinarily subjected. Their tests of the workings of the General Motors truck 1922 model likewise confirm these conclusions under all such conditions, except as made in extremely cold weather.

I am much more impressed with plaintiffs'

than with defendant's tests, the latter ones, though extensive, having called upon the mechanism to answer demands not at all likely to be met with in ordinary use. And yet concerning these latter tests one of defendant's experts says: "There is not really any fundamental discrepancy between the experimental limits of the plaintiffs and the experimental limits of the defendant. The plaintiffs got dry mixtures; the defendant got dry mixtures in substantially the same circumstances as plaintiffs."

In some of its tests, made under extreme conditions of load and speed, defendant claims sometimes to have obtained wet mixtures. A test such as this, largely artificial in its composition, is not persuasive. In view of the above findings, it is to me evident, and I am of the opinion that the Buick 1922 model and the General Motors truck 1922 model infringe all of the claims in issue, except that the truck does not preheat the air, and therefore does not infringe claim 10 of the process patent.

A decree in accordance with the foregoing will be entered with costs to the plaintiffs.